UNITED STATES of America,
Plaintiff–Appellee,

v.

Richard A. HEIDECKE, Jr.,
Defendant–Appellant.

Nos. 88–1749, 88–2178.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1989.

Resubmitted Oct. 25, 1989.

Decided May 1, 1990.

Thomas M. Durkin, David A. Glockner, Anton R. Valukas, David J. Stetler, James R. Ferguson and Victoria J. Peters, Asst. U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee U.S.

Aldo E. Botti, John R. Wimmer, Botti, Marinaccio, DeSalvo & Tameling, Oak Brook, Ill., for defendant-appellant Heidecke.

Before WOOD, Jr., CUDAHY, and KANNE, Circuit Judges.

HARLINGTON WOOD, Jr., Circuit Judge.

A federal jury found Richard A. Heidecke, Jr. guilty of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951(a), (b)(2). The court sentenced Heidecke to six months of unsupervised probation. Heidecke appeals from an interlocutory order denying his motion to dismiss on the basis of double jeopardy and from the judgment of the district court finding him guilty of attempted extortion.

We have jurisdiction to hear Heidecke's interlocutory appeal under the principles of 28 U.S.C. § 1291 and *Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977). We have jurisdiction to hear Heidecke's appeal from the final judgment of the district court under 28 U.S.C. § 1291. For the reasons stated below, we affirm.

## I. FACTUAL BACKGROUND

In Illinois, if a person receives three moving violations in a twelve-month period, the secretary of state suspends his or her driver's license. Ronald Seick got his third moving violation during a twelve-month period in April 1982. Accordingly, the secretary of state notified him in October that his license would be suspended for nine months beginning November 14, 1982. Such a suspension presented difficulties for Seick, a salesman paid on commission who traveled daily by car to service customers around the Midwest. Along with the notice of suspension, Seick had received an application for a temporary driving permit. By filling out and returning the application, Seick could get a formal hearing on his request for a permit.

Seick contacted Tom Benda, an Illinois attorney who had earlier represented Seick on a traffic violation, to ask for his assistance in obtaining a temporary driving permit. Benda advised Seick to contact Heidecke, a private attorney and hearing officer who heard applications for temporary

driving permits.[1] Heidecke was the cousin of Benda's law partner. Benda promised to call Heidecke and relate Seick's story. He also told Seick to call Heidecke himself.

In early November 1982, Seick phoned Heidecke a number of times concerning the issuance of a permit. On November 15, 1982, Heidecke told Seick that a temporary driving permit would cost $1,500, payable to him in cash or by check to Benda. After this conversation, Seick became suspicious, and he contacted another attorney who was concerned that Seick had misinterpreted Heidecke's remarks. Satisfied that Heidecke was not referring to $1,500 in attorneys' fees for Benda, the attorney advised Seick to contact the appropriate authorities and explain what had happened.

On November 22, 1982, Seick met with investigators from the secretary of state's office and agreed to assist them in an investigation of Heidecke. At the investigators' direction, Seick phoned Heidecke and asked whether Heidecke would accept a partial payment of the $1,500. Heidecke assented and told Seick to come to his office on November 29. Heidecke also informed Seick that he could get his temporary license within a week if certain microfilmed records were eliminated from Seick's driving record, thereby making it less likely that a supervisor would overturn Heidecke's decision to award a permit. Because of the secretary of state's office procedures, Heidecke could have easily arranged to preside over Seick's hearing.

Seick arrived at the November 29 meeting carrying $600 in bills with recorded serial numbers and equipped with a hidden electronic transmitter that sent signals to a remote tape recorder. Heidecke and Seick first discussed the details of the hearing. Heidecke then made a phone call to Benda's partner, requesting that Benda or another attorney accompany Seick to the hearing. Seick next gave Heidecke the $600 in marked bills, and Heidecke explained the procedures for paying the balance of the $1,500. After Seick left, the investigators from the secretary of state's office entered and arrested Heidecke.

Heidecke was indicted in an Illinois trial court. At the state trial, Heidecke was found guilty on one count of official misconduct and was acquitted on six other counts. Dismissing Heidecke's conviction, the state court subsequently granted a motion for an arrest of judgment based on Heidecke's claim that the indictment failed to allege an essential element in the offense of official misconduct.

Before and after these state proceedings, state prosecutors met with the United States attorney to request consideration of Heidecke's indictment on federal charges. Pursuant to the Department of Justice's *Petite* policy,[2] the United States Attorney's Office initially declined to press charges. Sometime prior to December 4, 1987, the United States Attorney's Office changed its mind, and an indictment was returned on that date. Certain personnel of the state prosecutor's office that had handled the Heidecke case had since transferred to work for federal law enforcement agencies, including the United States Attorney's Office. Although these personnel may have spoken to the United States attorney regarding Heidecke's case, it is clear that the United States attorney alone made the final decision as to whether to seek an indictment against Heidecke.

The five-year federal statute of limitations for Heidecke's offenses had run on November 29, 1987, but Heidecke had waived this defense in an earlier written agreement. A federal court subsequently

---

1. In Illinois, the secretary of state hires private attorneys to provide part-time legal assistance by serving as hearing officers or prosecutors in driving permit hearings. A supervisor reviews a hearing officer's decision to award or deny a permit.

2. The Department of Justice's *Petite* policy forbids dual federal and state prosecutions absent a compelling federal interest; a prior state prosecution must have left substantial federal interests substantially unvindicated. To conduct a dual prosecution, a United States attorney must receive permission from the appropriate assistant attorney general. *See generally United States v. Mitchell,* 778 F.2d 1271, 1274 n. 2 (7th Cir.1985). Of course, as an internal government guideline, the *Petite* policy gives Heidecke no substantive rights. *Id.* at 1276–77.

convicted Heidecke of attempted extortion in violation of the Hobbs Act, 18 U.S.C. § 1951 and sentenced him to six months of unsupervised probation. Heidecke appeals this conviction on the grounds of vindictive prosecution, double jeopardy, statute of limitations, evidentiary errors involving discovery and hearsay, and the lack of a nexus with interstate commerce.

In a prior unpublished order in this case, we held that Heidecke was entitled to an evidentiary hearing on the issue of whether he knowingly and voluntarily waived the statute of limitations. Therefore, while retaining jurisdiction, we remanded this case to the district court for development of the record with respect to the statute of limitations issue. On remand, the trial court held an evidentiary hearing and found that Heidecke had knowingly and voluntarily waived the statute of limitations. 683 F.Supp. 1215. We now address the remaining issues.

## II. DISCUSSION

### A. *Vindictive Prosecution*

Heidecke first contends that he was entitled to discovery, production of documents, and a hearing on his vindictive prosecution claim. Without affording him discovery, the district court denied Heidecke's pretrial motion to dismiss for vindictive prosecution. To support his vindictive prosecution claim, Heidecke argued that more serious federal charges were brought against him for exercising his statutory and constitutional rights in seeking a dismissal of the earlier state court indictment. Moreover, Heidecke pointed to the transfer of his former state prosecutors to prosecutorial positions in the federal government. Heidecke postulated that the state prosecutors used their new federal offices to avenge their earlier loss in state court, and he sought access to any evidence that would have helped prove this hypothesis. Thus, Heidecke has not suggested the existence of evidence that would directly prove actual animus, rather he suggests that we presume prosecutorial malice from these facts.

The threshold showing that the defendant must make to compel discovery on the issue of vindictive prosecution is a question of first impression. In the related area of selective prosecution, this court and other courts have firmly settled upon a rule that requires the defendant to show a colorable basis for the claim. *See Wayte v. United States*, 470 U.S. 598, 623–24, 105 S.Ct. 1524, 1538–39, 84 L.Ed.2d 547 (1985) (Marshall, J., dissenting); *United States v. Kerley*, 787 F.2d 1147, 1150 (7th Cir.1986); *United States v. Mitchell*, 778 F.2d 1271, 1277 (7th Cir.1985); *United States v. Kahl*, 583 F.2d 1351, 1355 (5th Cir.1978); *United States v. Murdock*, 548 F.2d 599, 600 (5th Cir.1977); *United States v. Cammisano*, 546 F.2d 238, 241 (8th Cir.1976); *United States v. Berrios*, 501 F.2d 1207, 1211–12 (2d Cir.1974); *United States v. Berrigan*, 482 F.2d 171, 181 (3d Cir.1973). Forcing the defendant to come forward with some evidence to support a charge of selective prosecution protects the interests in open and frank discussions within prosecutorial offices, *see Berrigan*, 482 F.2d at 181; protects the government from harassment or delay by criminal defendants, *see Wayte*, 470 U.S. at 624, 105 S.Ct. at 1539 (Marshall, J., dissenting); and frees the judicial system of criminal trials with irrelevant massive discovery, *see Murdock*, 548 F.2d at 600. At the same time, the relatively low burden recognizes that "most of the relevant proof in selective prosecution cases will normally be in the Government's hands." *Wayte*, 470 U.S. at 624, 105 S.Ct. at 1539 (Marshall, J., dissenting).

Some courts have suggested that defendants have to show more than a merely colorable claim before compelling discovery on a selective prosecution charge. *See United States v. Hintzman*, 806 F.2d 840, 846 (8th Cir.1986) (defendant must establish a prima facie case); *United States v. Greenwood*, 796 F.2d 49, 52 (4th Cir.1986) (defendant's allegations must raise a legitimate issue of improper government conduct). These cases, however, appear to arise more from misapplication of precedent than from reasoned analysis. *See, e.g., Hintzman*, 806 F.2d at 846 (drawing upon language in *United States v. Catlett*, 584 F.2d 864 (8th Cir.1978) to require the

defendant to establish a prima facie case). Because these heightened standards fail to account for the government's control over the facts relevant to a claim of selective prosecution, we decline to adopt them.

The same considerations that support a "colorable basis" standard for discovery in a claim of selective prosecution also support use of this standard in a claim of vindictive prosecution. Proof of vindictive prosecution, like proof of selective prosecution, is likely to involve a deluge of paper, probing the prosecutors' motives. Thus, we must guard against allowing claims of vindictive prosecution to mask abusive discovery tactics by defendants. At the same time, the defenses of selective prosecution and vindictive prosecution both require the defendant to probe the mental state of the prosecutors.[3] Requiring the defendant to prove more than a colorable claim before compelling discovery might prematurely stifle a legitimate defense of vindictive prosecution for lack of evidence.

Therefore, for claims of vindictive prosecution, we will adopt the same standard as is used for selective prosecution claims. To compel discovery on a defense of vindictive prosecution, the defendant must show a colorable basis for the claim. A colorable basis is some evidence tending to show the essential elements of the claim. *Mitchell*, 778 F.2d at 1277; *Berrios*, 501 F.2d at 1211–12. Thus, the defendant's claim of vindictive prosecution must rise beyond the level of unsupported allegations. *See United States v. Catlett*, 584 F.2d 864, 865 (8th Cir.1978).

In this case, Heidecke has failed to establish a colorable basis for his claim of vindictive prosecution. Heidecke quarrels with the decision to prosecute him in federal court. Citing *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974), Heidecke contends that vindictive prosecution occurs when the government increases the severity of charges against

an accused in response to the exercise of a statutory or constitutional right. Heidecke argues that the decision to seek a federal indictment against him was the result of vengeful prosecutors who sought to punish him for exercising his right to have the previous state indictment dismissed.

In *United States v. Goodwin*, 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982), the Court severely limited the presumption of vindictiveness that might arise out of the *Blackledge* case. The defendant in *Blackledge* had exercised his statutory right to a trial de novo upon appeal of a conviction for misdemeanor assault. 417 U.S. at 22, 94 S.Ct. at 2099. After the defendant filed his notice of appeal, the prosecutor obtained an indictment for felony assault, severely increasing the charges against the defendant. *Id.* at 23, 94 S.Ct. at 2100. The *Goodwin* Court saw *Blackledge's* presumption of vindictiveness as inextricably linked to the facts of that case. For a presumption of vindictiveness to arise, the facts of a case must implicate the institutional bias against retrying issues that already have been decided or implicate a personal stake of the prosecutor in the proceedings; in other words, there must be a realistic likelihood of vindictiveness. *Goodwin*, 457 U.S. at 376, 383–84, 102 S.Ct. at 2490, 2493–94. Thus, especially in the pretrial context, prosecutorial vindictiveness should not be presumed, and some kind of genuine prosecutorial animus should be directly or indirectly shown, *see United States v. DeMichael*, 692 F.2d 1059, 1061–62 (7th Cir.1982), *cert. denied*, 461 U.S. 907, 103 S.Ct. 1878, 76 L.Ed.2d 809 (1983).

Where there are successive prosecutions by two sovereigns, as in this case, it is improbable that a realistic likelihood of vindictiveness exists. *Cf. United States v. Robison*, 644 F.2d 1270, 1273 (9th Cir.1981) (doubtful whether a prosecution can be vindictive where the defendant's claim is that one sovereign is punishing him for rights

---

3. Intentional or purposeful selection of the defendant is an essential element of a claim of selective prosecution. W. LaFave & J. Israel, *Criminal Procedure* § 13.4(a) (1984). To prove vindictive prosecution, the defendant must gen-

erally show some kind of vindictive motive. *Id.* § 13.5(a). Thus, to a certain extent, both defenses require proof of the prosecutor's mental state.

he asserted against a different sovereign). With two sovereigns, the possibility of institutional bias against retrial and a personal prosecutorial stake in the proceedings is minimized. Heidecke's "showing" of vindictive prosecution does not rise beyond the level of mere allegations and conjecture. Beyond certain common personnel in the state and federal prosecutorial offices and the possibility that some of these personnel may have spoken with the United States attorney regarding a potential indictment, Heidecke offers no hard facts indicating a realistic likelihood of governmental misconduct. In addition, because the state indictment was dismissed on a technical defect, the federal indictment serves the strong federal interest in eradicating official corruption. The existence of a rational reason for the federal indictment further suggests that there is no reasonable likelihood of vindictiveness. Therefore, we will not presume actual vindictiveness, and in the absence of a colorable showing of animus, we must find that Heidecke is not entitled to discovery on his claim of vindictive prosecution.

■ To be entitled to a hearing on a claim of vindictive prosecution, the defendant must offer sufficient evidence to raise a reasonable doubt that the government acted properly in seeking the indictment. *United States v. Napue*, 834 F.2d 1311, 1329 (7th Cir.1987). This reasonable doubt standard is higher than the showing of a colorable claim that is essential to compel discovery. Because Heidecke failed to meet the lesser standard, he has necessarily failed to establish a reasonable doubt of governmental impropriety in order to receive an evidentiary hearing.

### B. *Double Jeopardy*

■ Heidecke also assigns error in the district court's denial of discovery and a hearing on his double jeopardy claim. The fifth amendment's prohibition against double jeopardy does not bar a federal prosecution following a state prosecution. *Abbate v. United States*, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); *see Heath v. Alabama*, 474 U.S. 82, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985). Double jeopardy does prohibit a federal prosecution that is merely a sham for a second state prosecution. *See Bartkus v. Illinois*, 359 U.S. 121, 123–24, 79 S.Ct. 676, 679, 3 L.Ed.2d 684 (1959).

In the circumstances of this case, Heidecke's double jeopardy claim essentially repeats his claim of vindictive prosecution. Heidecke argues that the federal prosecution was a sham because federal prosecutors who formerly worked as state prosecutors sought a federal indictment against Heidecke to avenge their earlier loss in state court. The same policy considerations that went into formulating a threshold standard for discovery in a vindictive prosecution case are equally applicable here. We must balance the government's interest in protection from abusive discovery versus Heidecke's need for facts that are almost solely within the control of the prosecutor. *See supra* Part II.A. Therefore, for Heidecke to obtain discovery on his double jeopardy claim on the facts of this case, he must make a colorable showing that the second prosecution was a sham.

For the same reasons as before, Heidecke's allegations do not make a colorable showing that the federal prosecution was a sham. *See id.* Once again, a strong federal interest existed in the punishment of official corruption. Heidecke escaped punishment at the state level only through a technical defect in the indictment. Because he violated federal law, the federal government had a substantial interest in ensuring that Heidecke's conduct did not go unpunished, and the existence of this rational explanation for the federal indictment further militates against any possibility that it was a mere sham.

■ Because of the similarities between vindictive prosecution and Heidecke's double jeopardy defense, we will likewise adopt the vindictive prosecution standard for obtaining an evidentiary hearing. To obtain an evidentiary hearing on the issue of double jeopardy, Heidecke had to offer sufficient evidence to raise a reasonable doubt that the federal indictment was proper and not a mere sham. *See United States v.*

*Napue,* 834 F.2d 1311, 1329 (7th Cir.1987). Heidecke failed to meet a lesser standard to compel discovery, and he is not entitled to an evidentiary hearing on his double jeopardy claim.

## C. *Statute of Limitations*

█ In our previous order, we remanded this case to the trial court for development of the record on the defendant's waiver of the statute of limitations. After an evidentiary hearing, the trial court fully and carefully determined that Heidecke had knowingly and voluntarily waived the statute of limitations. After the remand, Heidecke was allowed to file his written objections in this court to the trial court's findings, and the government filed a response.[4]

As part of his objections, Heidecke insists that we should make a de novo determination of the facts that led the district court to find he knowingly and voluntarily waived the statute of limitations. Whether a given set of facts indicates a knowing and voluntary waiver of the statute of limitations could arguably be a question of law appropriate for de novo appellate review. *See Marshall v. Lonberger,* 459 U.S. 422, 431, 103 S.Ct. 843, 849, 74 L.Ed.2d 646 (1983) (voluntariness of guilty plea on habeas review is question of law); *United States v. Hawkins,* 823 F.2d 1020, 1022 (7th Cir.1987) (voluntariness of confession is question of law). *But see United States v. Rodriguez,* 888 F.2d 519, 522, n. 1 (7th Cir.1989) (doubting whether voluntariness of confession is question of law). Heidecke, however, fails to recognize that, absent clear error, we will not overturn the district court's determination of what the given set of facts are. Stated another way, we will uphold the district court's findings as to historical or subsidiary facts unless clearly erroneous. *See United States v. Signori,* 844 F.2d 635, 638 (9th Cir.1988); *cf. United States v. Lima,* 819 F.2d 687, 688 (7th Cir.1987) (determination of probable cause is reviewed de novo but factual findings are upheld unless clearly erroneous). Because Heidecke only attacks the district court's findings as to the historical

facts, we need not decide the appropriate standard for reviewing the lower court's determinations as to the ultimate issues of knowledge and voluntariness.

When he signed the statute of limitations waiver, Heidecke alleges a prosecutorial misrepresentation was made to him that no final decision to seek an indictment had been reached. Heidecke asserts that if he had known that a final decision had been reached, he would not have signed the waiver because its only purpose would have been to extend the United States Attorney's Office additional time to comply with internal Department of Justice regulations applicable to Heidecke's case. If Heidecke's scenario were true, he might have a case that his waiver was not knowing and voluntary. *See Brady v. United States,* 397 U.S. 742, 757, 90 S.Ct. 1463, 1473, 25 L.Ed.2d 747 (1970) (suggesting governmental misrepresentations can make a guilty plea unknowing); *United States v. Jordan,* 870 F.2d 1310, 1316 (7th Cir.) (guilty plea is voluntary when not induced by threats or misrepresentations), *cert. denied,* —— U.S. ——, 110 S.Ct. 101, 107 L.Ed.2d 65 (1989). The district court, however, specifically found that a final decision was not made until after Heidecke waived his statute of limitations defense and that no prosecutorial misrepresentations were made to Heidecke or his attorney. These are historical or subsidiary factual findings that we will not overturn absent clear error.

United States Attorney Anton Valukas, and not one of his assistants, was the ultimate decision maker on whether to seek an indictment against Heidecke. Valukas's testimony provides us the only direct evidence as to when he finally decided to seek the indictment. The trial court credited Valukas's testimony that a final decision was not reached until after Heidecke signed the waiver, and we do not reexamine credibility determinations. *United States v. Marin,* 761 F.2d 426, 433 (7th Cir.1985). To attack the district court's findings, Heidecke states that actions and statements made by Valukas's assistants indicate a final decision had been made at

---

**4.** Heidecke also requested oral argument on this issue. That request is hereby denied.

the time of Heidecke's waiver. Specifically, Heidecke focuses on an assistant United States attorney's presentation of Heidecke's case to the grand jury and his efforts to obtain final Department of Justice approval for Heidecke's indictment. All of these events occurred a few days before a meeting ostensibly set up to aid Valukas in making a decision about Heidecke's indictment. Heidecke's approach, however, does not focus on Valukas as the final decision maker but instead concentrates on the actions of Valukas's subordinates in an attempt to show Valukas's state of mind. Moreover, it is clear that the efforts of Valukas's assistants were merely preparatory, undertaken so that quick action could be taken if Valukas eventually decided to proceed with Heidecke's indictment.

More fundamentally, Heidecke's approach would have us reweigh the conflicting evidence as if we were the initial trier of fact. Unless implausible in light of the whole record, we must defer to the trial court's factual findings rather than reassess the evidence ourselves. *Gorham v. Franzen*, 760 F.2d 786, 790 (7th Cir.), *cert. denied*, 474 U.S. 922, 106 S.Ct. 255, 88 L.Ed.2d 262 (1985). Heidecke's prosecutors were found to have truthfully represented that Valukas needed more time to make a final decision in light of issues raised during a meeting between Valukas and Heidecke's attorney. Also, the district court found that no misrepresentations were made to Heidecke regarding the persons whom Valukas might consult. These determinations were not clearly erroneous, and we will not reweigh the evidence as if we were reviewing the district court's decision de novo.

Heidecke also attacks the district court's findings as inherently unbelievable. He suggests that the United States Attorney's Office needed a waiver desperately because it could not obtain all the necessary approvals to indict Heidecke before the statute of limitations ran. Heidecke, however, admits that his prosecutors received final Department of Justice approval on November 23, 1987, at the latest. Even with grand juries unavailable over the upcoming Thanksgiving holiday weekend, the government still could have obtained an indictment against Heidecke on November 23, 24 or 25. Therefore, the evidence does not suggest that the government needed Heidecke's waiver only for additional time to obtain an indictment.

Heidecke lost his gamble that by giving his prosecutors more time, they might decide against proceeding with an indictment. Because Heidecke knowingly and voluntarily waived the statute of limitations, it is not a bar to his prosecution. *United States v. Meeker*, 701 F.2d 685, 688 (7th Cir.), *cert. denied*, 464 U.S. 826, 104 S.Ct. 96, 78 L.Ed.2d 102 (1983). We find no fault with the findings of the district judge.

### D. *Discovery of FBI Investigation*

After Heidecke's arrest, federal agents and state officials cooperated in an investigation to determine whether Heidecke previously had abused his position as a hearing officer for the Illinois secretary of state. The investigators comprehensively reviewed the secretary of state's files and records that involved Heidecke. The investigation did not reveal evidence of misconduct other than that charged in the indictment. The trial court denied Heidecke's motion to compel discovery of these materials. We review the district court's decision on this issue under an abuse of discretion standard. *United States v. Mitchell*, 778 F.2d 1271, 1276 (7th Cir.1985).

■ Proof that a defendant acted lawfully on other occasions is not necessarily proof that he acted lawfully on the occasion alleged in the indictment. *See United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir.1985). Heidecke acknowledges this general rule but instead argues that the fact he never engaged in previous wrongdoing would support his defense of entrapment. One of the entrapment defense's essential elements is that the defendant show a lack of predisposition toward committing the crime. *United States v. Hawkins*, 823 F.2d 1020, 1024 (7th Cir.1987).

■ We cannot find that the trial court abused its discretion. The trial court spe-

cifically found that no prejudice would result to Heidecke's entrapment defense if the investigation materials were not produced. As the trial court noted, if Heidecke's employment record at the secretary of state is unblemished, this record should speak for itself on the issue of his predisposition. At best, the investigation's results would have been merely cumulative of other evidence that Heidecke could have offered.[5]

### E. *Hearsay Objections*

1. "Nobody from this office will deal with that case unless Mr. Seick brings in $1,500."

█ Heidecke's victim, Seick, had initially contacted attorney Benda regarding his imminent license suspension. At trial, Heidecke sought to introduce testimony from Benda's secretary that she overheard Benda make the above statement, indicating that he wanted a $1,500 fee for taking Seick's case. This testimony would have supported Heidecke's theory that he received the $1,500 payment on behalf of Benda for services rendered to Seick. The district court excluded Benda's testimony on hearsay grounds.

Heidecke argues that he offered Benda's statement as nonhearsay evidence of Heidecke's state of mind. Conceivably, every utterance could be indicative of someone's state of mind. Thus, Heidecke's argument would restyle the hearsay rule into an evidentiary presumption of admissibility: litigants would merely have to fashion out-of-court statements as probative evidence of someone's thoughts. We do not hesitate to reject Heidecke's broad formulation of the state-of-mind exception to the hearsay rule.

Rather, it is plainly obvious that Heidecke offered Benda's statement for its truth. At trial, Heidecke attempted to cast himself as Benda's informal escrow agent, taking Seick's money on Benda's behalf. Benda's statement would only have corroborated Heidecke's story, and to say that the statement was evidence of Heidecke's state of mind merely is a rephrasing of the underlying purpose of corroboration. We agree with the trial court that Heidecke offered Benda's statement for its truth.

2. "Type up an envelope for Tom Benda, and give him a call, and let him know this money is here—oh, never mind, I will just keep it myself and give it to him because he probably won't come over and pick it up."

█ Heidecke also wanted to introduce his own secretary's testimony that he made the above statement to her shortly after Seick had left but before Heidecke's arrest. In addition, Heidecke's secretary would have testified that, on the morning before his arrest, Heidecke left instructions to tell Seick that he was unavailable. The trial court excluded all of this testimony on hearsay grounds.

To a limited extent, Heidecke's arguments do raise possibly legitimate exceptions to the hearsay rule. We find, however, that any error by the trial court was harmless. First, while prohibiting testimony about verbal remarks, the trial court did allow Heidecke's secretary to testify that Heidecke had started to hand $1,500 to her and that she understood the money should go to Benda. Much of the evidence excluded by the trial court's ruling thus reached the jury anyway. Second, there was substantial evidence of guilt, including the damaging tape-recorded transaction between Seick and Heidecke. *See United States v. Monzon,* 869 F.2d 338, 345 (7th Cir.) (error is harmless where evidence is overwhelming), *cert. denied,* —— U.S. ——, 109 S.Ct. 2087, 104 L.Ed.2d 650 (1989). Therefore, we cannot find reversible error

---

**5.** We disagree with Heidecke's assertion that *United States v. Sternstein,* 596 F.2d 528 (2d Cir.1979) is applicable to this case. In *Sternstein,* the defendant was charged with fraudulently filling out income tax returns. An investigation revealed that the defendant filled out relatively few false returns out of hundreds that he had prepared. The *Sternstein* court held that the defendant was entitled to discovery of the investigation's papers to rebut the government's theory that the defendant had engaged in a broad scheme of generating new business by fraudulently filling out a few returns. In this case, the government does not allege that Heidecke engaged in a broad scheme, and *Sternstein* is not persuasive precedent.

in the trial court's rulings on these hearsay issues.

### F. *Nexus to Interstate Commerce*

██ Finally, Heidecke maintains that the government failed to prove beyond a reasonable doubt that his activities had a requisite connection to interstate commerce.[6] Jurisdiction under the Hobbs Act is satisfied by showing that the defendant's activities had a realistic probability of affecting interstate commerce. *United States v. Jarrett*, 705 F.2d 198, 202 (7th Cir.1983), *cert. denied*, 465 U.S. 1004, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984). Seick, Heidecke's victim, is like the interstate truck drivers who paid bribes to local officials to fix traffic tickets in *United States v. Anderson*, 809 F.2d 1281 (7th Cir.1987). Seick testified that he covered a multi-state area in his job as a salesman. Thus, his activities have a direct effect on interstate commerce, and we need not resort to questions of indirect effect, *see generally United States v. Mattson*, 671 F.2d 1020 (7th Cir.1982). The evidence easily could have allowed a jury to conclude beyond a reasonable doubt that Heidecke's activities had a realistic probability of affecting interstate commerce.

### III. CONCLUSION

Heidecke has not presented this court with any basis to overturn his conviction. Therefore, his conviction is

AFFIRMED.

---

**6.** The Hobbs Act only applies to crimes in interstate commerce. *See* 18 U.S.C. § 1951(b)(3).